Filed 4/8/14  In re A. R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,      Plaintiff and Respondent, | E058645 |
| v. | (Super.Ct.No. J247974) |
| D.R.,      Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant D.R. (mother) contends that there was insufficient evidence to support the court's jurisdictional findings concerning her daughter, A.R. (the child). She also argues that the court erred in removing the child from her custody, and that the court's visitation order was improper. We disagree and affirm.

PROCEDURAL BACKGROUND

On February 6, 2013, the San Bernardino County Children and Family Services (CFS) filed a Welfare and Institutions Code[1] section 300 petition on behalf of the child, who was 14 years old at the time. The petition alleged that the child came within the provisions of section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The petition alleged that mother left the child alone and unattended for three days and two nights, and left her without any prior arrangements for care and supervision. It also alleged that mother failed to provide adequate shelter and safety for the child, in that the home was extremely cluttered and had sanitation concerns. The petition also alleged that mother had a history of prescription drug abuse and ongoing mental health problems. In addition, the petition alleged that the child's father (father)[2] currently resided in Nebraska and was therefore unable to provide care and supervision for the child.

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] Father is not a party to this appeal.

2

*Detention*

The social worker filed a detention report which stated that, on February 4, 2013, he received a referral for general neglect and caretaker absence regarding the child. The child had come to school that day wearing flip flops, which was against the school dress policy. There was no one to contact to bring her proper shoes, so she spent the day in detention. When the social worker arrived at the school to interview her, the child had left for the day. The social worker and a deputy went to the child's residence, and the child stepped outside to be interviewed. The child stated that mother and her boyfriend went to Fresno on February 2, 2013, and that she had not been able to maintain contact with mother, except for a few text messages through mother's boyfriend's phone. The child said she had no knowledge of when mother would be returning. She further reported that mother did not arrange for care or supervision. The child said that mother left her alone approximately once a week, and that she would be gone for "hours, days, and nights at a time, with no prearranged care and supervision." During mother's absences, the child was not able to get in contact with mother. The child was left to take care of mother's six dogs in the home. The child said she missed 21 days school due to mother's absences, as well as her own medical condition of "degenerative . . . spinal disks [*sic*]."

The deputy requested to check the condition of the home. When the social worker and the deputy entered the home, they immediately noticed a foul odor of urine and feces. There were dark spots on the carpet, which were reportedly the residue from tar traps

3

used to deal with rodent infestations years ago. The kitchen was cluttered with dirty dishes and utensils.

The social worker called the child's father in Nebraska and found out that he had joint legal custody, and his divorce was still pending. Father expressed concern that mother would leave the child unattended for days and nights frequently. He said he wanted to take care of the child and was able to, but the child custody order was preventing him from doing so. He "believe[d] he had 5 or 15% custody." The child said she wanted to be reunited with father.

One of the child's neighbors saw the police car and came over to see how the child was doing. The neighbor said he was greatly concerned for the child, since she had to do her own shopping and cooking, and make her own arrangements, since mother was "always gone." The neighbor said that the child's older brother previously lived in the home and took care of the child. However, once he turned the age of majority, he could not wait to move out.

Mother pulled into the driveway during the interview. She raised her voice at the child and asked the child what she had reported. Mother denied a history of leaving the child alone at night, and stated that the child's older brother was in the house when she was gone. Mother stated that the child was almost 15 years old, knew her neighbors, and knew how to call 911 in case of an emergency. The child pulled the social worker aside and stated that she could not be left with mother, as "[mother] will go off on [her.]"

4

The social worker and deputy left to get a warrant to take the child into protective custody. When they returned, the child was sitting on the curb side. She said she was waiting for their arrival so that she could be rescued from mother's care.

A juvenile court held a detention hearing on February 7, 2013. Mother was present, and father appeared telephonically. The court detained the child in foster care. The court also authorized the social worker to assess relatives and father's home for possible placement. The child's counsel confirmed that the child wanted to go and live with father as soon as possible. The court noted that mother was claiming to have Indian ancestry and ordered her to complete the Indian Child Welfare Act (ICWA) form. CFS subsequently received a confirmation letter from the Cherokee Nation that the child was an enrolled member.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on February 25, 2013, recommending that the court sustain the petition and provide reunification services. The social worker reportedly spoke with mother on February 13, 2013, and mother admitted she left the child home alone for the weekend of February 2, 2013. She stated that she had a long-standing agreement that her friend, Dolly, would be the "go-to person" for the child, in case of an emergency in her absence. However, she admitted that Dolly did not like to deal with the child because of the child's disregard for authority. Mother eventually agreed that it was not a good decision for her to leave the child home alone for the extended period of time. The social worker noted that this was not the first time

5

mother left the child home alone and expected her to care for herself. The child stated that she did not want to return to mother's home because she felt that she was a burden to her mother, and that she interfered with her mother's life with her boyfriend. Both mother and the child denied that there was any concern about mother's misuse of prescription medication. Mother also denied having any mental health issues.

The social worker contacted father again, and he said he had been out of the home for the past two years. He and mother were married prior to the child's birth, and he was listed on the child's birth certificate. He said he would be able to adequately provide for his daughter.

At a hearing on February 28, 2013, mother's counsel informed the court that the child was refusing to return home to mother. The court ordered CFS to assess father's home in Nebraska.

In an addendum report filed on March 28, 2013, the social worker recommended that the court find true all of the allegations in the petition, except for the allegations regarding mother's mental health history and prescription drug abuse. The social worker further recommended that the court issue a custody order for father, the noncustodial parent, and dismiss the dependency. The social worker visited father's home in Nebraska and assessed it as being an appropriate placement. Father was a private music teacher, and he was being retrained to become a certified nursing assistant. He had family support in Nebraska, with several relatives who lived nearby. He said his mother could care for the child, if he had to work late.

At a hearing on April 3, 2013, a representative from the Cherokee Nation confirmed that if the court granted custody to father and dismissed the case, then no ICWA expert would be needed. The court asked if the social worker assessed father's home, and the social worker confirmed that he assessed the home, and it was "very appropriate." The court authorized the child to have an extended visit in Nebraska to be with father.

On April 30, 2013, the court held a jurisdiction/disposition hearing. County counsel reported that the child was currently with father, and that CFS was recommending that the court take jurisdiction, dismiss the dependency, and grant custody to father. A tribal representative from the Cherokee Nation was telephonically present and stated that there were no objections to granting father custody and dismissing the case. Mother's counsel objected to the allegation that mother failed to provide adequate shelter and safety for the child, arguing that mother told the social worker she "left plenty of provisions for the child when she left town for that weekend." The child's counsel submitted on the recommendation, noting that the child had been adamant about wanting to be with father, and that the child was happy being with him now. The court found true the allegations that mother left the child for three days and two nights without prior arrangements for care/supervision, and that mother failed to provide adequate shelter and safety for the child. The court thus found that the child came within the provisions of section 300. It also found that father was the presumed father, that he was the noncustodial parent, and that he was willing and able to assume custody of the child. The

court then removed the child from mother's custody, placed the child with father, ordered the family law order to be filed, and dismissed the dependency case. As to visitation between mother and the child, the court ordered weekly phone calls, three weeks of visits each summer, and alternate visits for Thanksgiving and Christmas each year. The court noted that the child was "not to be forced" to visit.

## ANALYSIS

### I. There Was Sufficient Evidence to Support the Court's Jurisdiction of the Child

Mother argues that there was insufficient evidence to support the jurisdictional findings concerning the child. She contends that there was no substantial evidence to show that leaving the child home alone over the weekend violated any laws or resulted in any serious physical harm to the child, or that "a couple of dirty dishes and the mess created by [the child's] refusal to clean up after herself and do her chores was mother's fault[,] or that the home's condition rose to the level of a filthy home to warrant the court's intervention." Mother further claims that her "single act of inappropriate supervision" was insufficient to warrant the assumption of jurisdiction. We conclude that the court properly took jurisdiction of the child.

"The standard of review in juvenile dependency cases is the same as in other appeals on grounds of insufficiency of the evidence. We review the record to determine whether there is any substantial evidence, contradicted or not, which supports the court's conclusions. 'All conflicts must be resolved in favor of the respondent and all legitimate

8

inferences indulged in to uphold the verdict, if possible.' [Citation.]" (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649.)

We initially note that "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) In other words, "'the juvenile court's jurisdiction may rest on a single ground.' [Citation.]" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83.)

Section 300, subdivision (b), provides that the juvenile court may adjudge a child a dependent of the juvenile court when the child has suffered, or there is a substantial risk that the child will suffer, serious harm or illness, "as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . ."

Here, the petition alleged that mother failed to provide adequate shelter for the child, in that the home was extremely cluttered, and there were sanitation concerns. The

9

evidence clearly supported this allegation. When the social worker visited the home, he immediately noticed a foul smell of urine and feces. There were three dog cages by the kitchen with pads underneath them to collect the dogs' urine and feces. He observed the kitchen to be cluttered with dirty dishes and utensils. The carpet had black stains that were the residue of tar traps used to control rodents. The neighbor told the social worker that he was greatly concerned for the child and that the conditions of the home were not suitable for her.

The petition also alleged that, on or about February 2, 2013, mother left the child alone for three days and two nights, leaving her without any prior arrangements for care and supervision. Mother admits that she left the child alone for the weekend, but asserts that she had "a standing agreement" with her friend, Dolly, to be the child's "go-to person." She also contends that her "single act of inappropriate supervision" was insufficient to warrant the court taking jurisdiction over the child. However, on February 4, 2013, the child spent the entire day in detention at school because there was no one available to contact for help. If there was a "standing agreement" with Dolly, the child apparently did not know about it. Moreover, the child was afraid of Dolly, and mother knew that Dolly did not like to deal with the child. We also note that the child did not know when mother planned on returning home on the weekend at issue.

Furthermore, the evidence showed that, rather than being "a single act" of neglect, mother frequently left the child alone. The child reported that mother was often gone for "hours, days, and nights at a time, with no prearranged care and supervision." She said

10

that mother was absent approximately once a week. During mother's absences, the child was not able to get in contact with her. The neighbor similarly reported that mother was always gone and left the child to do her own shopping and cooking. Father also expressed concern that mother would frequently leave the child unattended for days and nights.

We conclude that there was substantial evidence that the child was at risk of harm by mother's failure to provide a clean, safe home, or proper care and supervision for the child. Thus, the evidence supported the court's jurisdictional findings.

II. The Court Properly Granted Father Custody of the Child and Terminated its Jurisdiction

Mother argues that the court's disposition order must be reversed because the court failed to make the requisite findings under section 361, and the order was not supported by sufficient evidence. We disagree.

Section 361, subdivision (c)(1), provides in relevant part: "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody."

11

"'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]' [Citations.] . . . We review an order removing a child from parental custody for substantial evidence in a light most favorable to the juvenile court findings. [Citations.]" (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

Section 361.2, subdivision (a), "establishes the procedures a court must follow for placing a dependent child following removal from the custodial parent pursuant to section 361. [Citation.] Subdivision (a) of section 361.2 provides that when a court orders removal of a minor under section 361, the court 'shall first determine' whether there is a parent who wants to assume custody who was not residing with the minor at the time the events that brought the minor within the provisions of section 300 occurred. [Citation.] If that parent requests custody, the court 'shall place' the child with the parent unless 'it finds that placement with that parent would be detrimental to the minor.' [Citation.]" (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820, fn. omitted.) If the court places the child with that parent, it may order that the parent become legal and physical custodian of the child and terminate jurisdiction. (§ 361.2, subd. (b)(1).)

Here, the record demonstrates that the court made the appropriate findings under section 361, and that the court's removal order was supported by substantial evidence. At

12

the April 30, 2013 jurisdiction/disposition hearing, the court expressly stated that there was "a substantial danger to the child's physical health and her emotional well-being," and that there were "no reasonable means by which the child [could] be protected without removing [her] from the mother's custody." The court further found that "[r]easonable efforts were made to prevent or eliminate the need for removal." (§ 361, subds. (c)(1) & (d).)

Furthermore, there was sufficient evidence to support the dispositional order. The home where the child was living was unsanitary, as previously discussed. (See *ante*, § I.) Mother asserts that she gave away three of her dogs, and thereby eliminated the sanitation concerns and clutter from her home. However, the child reported that mother had six dogs. Furthermore, removing half of the dogs did not address the risk of leaving the child to take care of herself for long periods of time, including overnight. The record showed that mother left the child alone approximately once a week, with no prearranged care or supervision. The child had no ability to contact mother either. Moreover, the child had a medical condition of "degenerative . . . spinal disks [*sic*]." Thus, the record supported the court's finding that there was a substantial danger to the child's physical health and well-being in mother's home.

We further note that the child did not want to stay in mother's care, but wanted to be with her father. At the time of the jurisdiction/disposition hearing, the child had been staying with father temporarily, and she was happy and doing well in his care. Father requested custody of the child. The social worker reported that father had steady

employment and stable housing.  Father's home was found to be suitable for placement of the child.  Father had a lot of family support to help him take care of the child.

All of this evidence amply supported the court's decision to remove the child from mother's custody, place the child with father, and terminate jurisdiction.  (§§ 361, subd. (c)(1), 361.2, subds. (a) & (b)(1).)

III.  The Juvenile Court Did Not Impermissibly Delegate the Authority to Determine Visitation to the Child

Mother argues that the court impermissibly delegated authority to decide whether any visitation would occur by stating that the child was not to be forced to visit. Accordingly, she contends that the visitation order was an abuse of discretion and asserts that this court must reverse the order to ensure that some visitation occurs.  We decline to reverse the order.

Mother relies on such cases as *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter S.*) and *In re Julie M.* (1999) 69 Cal.App.4th 41 (*Julie M.*) to support her assertion that a juvenile court may not delegate to a third party the discretion to determine whether visitation will occur.  We note that these cases involved visitation orders made by the court in dependency cases where visitation was critical to facilitating reunification. (*Hunter S.*, at pp. 1504-1505; *Julie M.*, at pp. 43, 49.)  We recognize that a juvenile court orders visitation in order to maintain ties between a parent and child, and "to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent." (§ 362.1, subd. (a).)  However, the instant case is procedurally distinguishable,

14

in that the court here ordered the removal of the child from mother's custody, placed the child with father, and terminated its jurisdiction over the child. (§ 361.2.)

In any event, the visitation order here does not represent an improper delegation of judicial power. First, the court did not grant the child *complete* and *total discretion* to determine whether or not visitation would occur. The court ordered weekly phone calls, including by means of Skype or video conference calls. Second, there was no delegation of judicial power to the child, even though the court stated that the child was "not to be forced." In the context of the court's order, the statement meant that the child should not be forced to visit with mother against her will, but it did not suggest that the child was authorized to "do more than express [her] desires in this regard." (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237.)

Furthermore, we note that mother's position ignores the appropriate concern of the juvenile court, which was the possibility of adverse psychological consequences of an unwanted visit between mother and child. There was substantial evidence in the record that the child felt neglected, unloved, and even afraid of mother. Thus, it was reasonable for the court to believe that forced contact would not be beneficial to the child. (See *In re Danielle W.*, *supra*, 207 Cal.App.3d at p. 1238.) In considering the interests of the child, the court did, in fact, order visitation under the one condition that the in-person visits would be when the child desired such contact. The court's order "does not constitute punishment of the parent but rather protection of the minor's psychological well-being." (*Id*. at p. 1239.)

We additionally note that when a juvenile court terminates its jurisdiction over a dependent child and enters visitation orders that are transferred to an existing family court file, the parties thereafter may seek the assistance of the superior court to enforce or modify the order.  (*In re Hirenia C*. (1993) 18 Cal.App.4th 504, 518.)  Thus, if visitation does not occur with the child to mother's satisfaction, mother may seek to modify the order through the family law court.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.